**THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN IN DISTRICT OF FLORIDA**

**MIAMI DIVISION**

**CASE NO: _____**

MICHAEL BALUJA,

     Plaintiff,

vs.

CITY OF CORAL GABLES

     Defendant.

_____/

**COMPLAINT[1]**

    Plaintiff, Michael Baluja ("Baluja"), sues the City of Coral Gables and says:

**PARTIES, JURISDICTION AND VENUE**

    1.    Baluja is an employee of the Defendant as an officer in the Coral Gables Police Department and currently serves in the US Army National Guard. He is a service member as defined within the meaning of the USCERRA, SCRA, and FUSPA.

    2.    Defendant, City of Coral Gables ("the City") is an employer as defined within the meaning of the USERRA and the FUSPA.  It operates as part of the City, the Coral Gables Police Department ("CGPD")

    3.    This Court has jurisdiction over this action pursuant to Fla. Stat. § 250.80-

---

[1] This case was originally removed to this Court on June 23, 2023, Case No 1:23-cv-22331 KMW. Because Baluja was deployed in the United States Army on July 19, 2023, and therefore was unable to assist in the prosecution of this action, he took a voluntary dismissal on December 21, 2023. This is a re-filed action. The allegations are updated and therefore not the same as the original complaint.

.84, Fla Stat. § 115.15, 28 U.S.C. § 1331, 38 U. S.C. § 4323(b), and 50 U.S.C. §4 092.

4.      The United States District Court for the Southern District of Florida is a proper venue for this action under 38 U.S.C. § 4323(c)(2)  because Baluja, at all material times relevant to this Complaint, resided in either Broward County or Miami-Dade County, Florida. He currently resides in Broward County.  Defendant maintains its place of business in Miami-Dade County, Florida, and the causes of action and claim initially arose in Miami-Dade County, Florida

5.      These claims are brought pursuant to the Uniformed Services Employment and Re-employment Rights Act of 1994, as amended (38 U.S.C. § 4301, *et seq*., hereinafter called "USERRA"), the Servicemembers Civil Relief Act ("SCRA"), 50 U.S.C. §4092, and the Florida Uniformed Servicemembers Protection Act ("FUSPA"), Fla. Stat. § 250.80, *et seq*., to recover benefits with interest, front pay and back pay with interest, benefits with interest, an additional equal amount as liquidated damages, compensatory damages, declaratory relief, damages for pain and suffering, severe emotional distress, mental suffering, debilitating anger, psychological trauma, hostile work environment, loss of enjoyment of life, and reasonable attorney's fees, costs, and expenses.

6.      Baluja is seeking in excess of $75,000.00 exclusive of attorneys' fees and costs.

## **FACTUAL ALLEGATIONS**

7.      Baluja has been an officer with CGPD for almost 20 years and has served with its SWAT Team for almost 19 years.

8.      Baluja has served in the United States Army Special Forces as a Green

Beret for more than a decade with over eight overseas deployments. Baluja's additional qualifications include, but are not limited to: Special Forces Sniper Instructor, Special Forces Advanced Urban Company Instructor, and Special Operations Combative Instructor.

9.      Baluja is now an active member of the United States Army National Guard.

10.     The Florida Legislature enacted the Florida Uniformed Servicemembers Act (FUSPA) to protect members of the military who deploy in the defense of the United States.  The FUSPA incorporates, by reference, both the Servicemembers Civil Relief Act and the USERRA.

11.     Violations of the USERRA are *de facto* violations of the FUSPA.

12.     USERRA/FUSPA prohibits employment discrimination based upon past, current, or future military service.

13.     Sophisticated employers like the City and its CGPD are held to higher standards for violations of the FUSPA and the USERRA.

14.     When an employer has written policies and personnel who are responsible for complying with the legal requirements of the FUSPA and the USERRA, there will arguably be a finding of willful violation of the FUSPA and the USERRA.

15.     The City's intentional disregard for the FUSPA and the USERRA and the legal rights of Baluja is patently apparent in its procedures and treatment of Baluja.

16.     Pursuant to Fla. Stat § 115.07 and Coral Gables' Personnel Rules and Regulations 12.8.1, Baluja is entitled to receive military leave with pay for up to 240 working hours (30 work days)  every calendar year. That leave pay is in addition to

Baluja's entitlement to pay pursuant to Fla. Stat § 115.09 and Coral Gables' Personnel Rules and Regulations 12.8.2, which entitles a  service member to receive their full pay during the first thirty (30) days of any period of military  leave for active military service.

17.     Defendant routinely and maliciously, and unpatriotically challenged Baluja's orders from the U.S. Army National Guard for more than five years, ignoring the service exemptions which do not count toward cumulative service.

18.     Employees do not need to obtain any permission or approval from their employers before departing to perform qualifying uniformed service.

19.     Employee handbooks and leave policies are not to attempt to impose more onerous obligations on Servicemembers than the USERRA with respect to advance notice of an absence or its particular format.

20.     Employers are not to utilize policy language that suggests that military leave is subject to employer approval.

21.     Employers may not demand written orders or any other official documentation concerning the employee's uniformed service prior to the employee's departure from work.

22.     On May 3, 2023, the CGPD changed its Standard Operating Procedure to include servicemember employees to submit requests for military leave, and created new and additional onerous procedures for servicemember employees to follow that directly violate the FUSPA and the USERRA.

<u>Violations of the FUSPA Prior to May 2023</u>

23.     Prior to any deployment longer than 30 days, an exit interview is required with the Chief of Police, Edward Hudak ("Chief Hudak").

24.     During Baluja's September 2018 Exit Interview, Chief Hudak asked Baluja is he was volunteering for the deployment orders from the U.S. Army or whether they were mandatory. Baluja informed Chief Hudak that when Baluja's team gets called to active duty, Baluja goes with the team. Chief Hudak then indicated that if Baluja continued to leave on military duty, Chief Hudak intended to replace his position on the Marine Patrol Unit.

25.     Defendant subsequently replaced Baluja's position on the Marine Patrol Unit where he had served for over 12 years, despite the position having a vacancy which had not been filled in three years.

26.     Baluja's removal from the Marine Patrol Unit was directly related to Baluja's call to and adherence to orders for military service.

27.     Baluja's removal from the marine patrol unit resulted in his loss of special unit pay.

28.     In February 2019, Baluja was asked by Uniform Division Patrol Division Commander Major C. Atherley ("Major Atherley"), if Baluja would be willing to be a guest speaker at a department leadership training. Major Atherley requested that Baluja speak on his experience with leadership and how leadership can impact operations from a military standpoint. Baluja agreed, prepared his speech and dress uniform for the presentation. The evening before the presentation, Baluja received a call from Major Atherley informing Baluja that Chief Hudak had become aware of Baluja's role in the presentation and that Chief Hudak had requested that Baluja not speak at the department training. As a result, Baluja was denied the opportunity to make his presentation.

29.     In June 2019, Baluja submitted a memorandum from his military chain of command referencing an upcoming deployment that required relaxed grooming standards for operational necessity. Despite the memorandum being sent up the chain of command all the way to Chief Hudak, Baluja never received a written response to the memorandum, and was required to maintain the standard grooming standards up until the day Baluja's active orders started. The only explanation given to Baluja was Major Atherley stating that "Chief Hudak wanted to do his own research." The military contact on the memorandum (specifically Captain Stoute), was never contacted by any member of the CGPD in reference to the specific request for the need for relaxed grooming standards for operational necessity.

30.     In September 2019, the City suddenly stopped paying Baluja.

31.     All of Baluja's proper documentation was delivered to the proper departments. In the past, Baluja had always initiated pay inquiries directly to the Human Resources ("HR") Dept K. Ingersoll. The direct line of communication allowed Baluja to supply HR with his paystubs and address any issues that may have arisen.

32.     Chief Hudak instructed Baluja's chain of command that Baluja was not to contact HR directly, but only through Baluja's direct chain of command to include pushing Baluja's  military paystubs by memorandum up the chain of command at the police department.

33.     Upon information and belief, CGPD does not require these restrictive and invasive procedures with other employees. In fact, the Standard Operating Procedures of CGPD direct servicemember employees to submit this documentation to the Director of Human Resources.

34.     Baluja repeatedly expressed concerns about the requested information being exposed to more individuals within the department than necessary.

35.     As already known by Defendant, Baluja's military career, orders, and deployments are of a sensitive nature and unnecessarily exposing the information to needless personnel is careless and damaging to operational security.

36.     Baluja repeatedly asked, in writing, to his chain of command as to why Defendant initiated the change in procedure that caused unnecessary delay of document transfer and exposure of Baluja's sensitive personal and military operational information.

37.     The only response received by Baluja was that he was "not allowed" to directly contact Human Resources.

38.     Baluja did not receive a paycheck from Defendant for approximately two months while deployed, nor was an explanation provided for Defendant's failure to pay Baluja.

39.     During Baluja's 2020 deployment, he was injured and required treatment at Walter Reed Medical Center for five months for surgery and post-surgery rehabilitation.

40.     Upon returning to work for Defendant in August 2020, Baluja was asked to provide a medical release from physicians. Under the guidance of Sergeant J. Nunez ("Sgt. Nunez"), Baluja submitted a redacted release which redacted the confidential military records regarding Baluja's injuries while deployed.

41.     The medical release provided to Defendant specified that Baluja was "Released w/o limitations" on June 1, 2020. There was no cause to require further

medical release for Baluja. This action against Baluja was taken as a result of Baluja's military status, a violation the FUSPA and the USERRA.

42.     Despite this release, Chief Hudak insisted on a meeting with Baluja and Sgt. Nunez in which he stated that [Chief Hudak] needed to see the complete injury, diagnosis, procedures, and treatments for Baluja to be able to return. Chief Hudak insisted on this elevated standard despite the medical release having been provided through the Professional Standards chain of command in order to facilitate HR medical compliance and prevent Baluja's delay to return of duty with Defendant CGPD. This action was taken as a result of Baluja's military status, a violation the FUSPA and the USERRA.

43.     CGPD did not request that Baluja submit to a medical or psychological evaluation prior to returning to duties.

44.     Chief Hudak then placed Baluja on Administrative Leave, stripping Baluja of all law enforcement authorities and duties, without cause, for approximately a month. This action was taken as a result of Baluja's military status, a violation the FUSPA and the USERRA.

45.     On or about September 15, 2020, Defendant City's Human Resources Director wrote to Baluja's military chain of command requesting all of Baluja's military records, and attempting to determine whether Baluja had surpassed the USERRA requirements.

46.     Chief Hudak further requested that Baluja be excused from attending upcoming military duty, alleging that Baluja had not completed reintegration, which was only delayed by Chief Hudak's malicious actions towards Baluja.  This action was taken

as a result of Baluja's military status, a violation the FUSPA and the USERRA.

47.    Once Baluja was able to return to work with CGPD, he was placed on Probationary Police Officer (PPO) status requiring that he ride with a Field Training Officer (FTO) who had to fill out Daily Observation Reports (DOR).

48.    This process had not been previously used on any officer who had taken extended leave for any reason. This process to date has only been used on Baluja and other military servicemembers returning from active duty, a violation the FUSPA and the USERRA.

49.    From February 2021- April 2021, CGPD shorted Baluja's pay during periods of active military orders, a violation the FUSPA and the USERRA.

50.    In June 2021, Baluja and other servicemembers were prohibited by CGPD from bidding on work shifts as a result of their being absent due to their military service, a violation the FUSPA and the USERRA.

51.    Without Baluja's consent, his annual leave was used to cover his military leave, again violating the FUSPA and the USERRA, and placing Baluja on "NO PAY" status.

52.    From June 7-17, 2021, 72 hours were taken from Baluja's annual leave bank without his consent. This action was taken as a result of Baluja's military status, a violation the FUSPA and the USERRA.

53.    From June 5-23, 2021, 140 hours were taken from Baluja's compensatory leave bank over Baluja's objection. This action was taken as a result of Baluja's military status, a violation the FUSPA and the USERRA.

54.    In July 2021, Baluja was contacted by Lieutenant John Carrasco ("Lt.

Carrasco") inquiring when Baluja would be returning to CGPD from Baluja's current military orders.

55.     Baluja reminded Lt. Carrasco that Baluja's orders end date was August 1, 2021. In violation of the USERRA and the FUSPA, Lt. Carrasco demanded that Baluja indicate whether Baluja wished to use sick leave, compensatory leave, or annual leave, for the time he was on military orders.

56.     Despite Lt. Carrasco being informed that the USERRA regulations do not require a service member to use personal accrued leave while on military orders, Lt. Carrasco stated that Defendant's regulations did have that requirement.

57.     These communications were memorialized in writing by emails on July 16, 2021.

58.     From August 29-September 25, 2021, Baluja was again ordered to active duty and placed on NO PAY status by  CGPD. This action was taken as a result of Baluja's military status, a violation the FUSPA and the USERRA.

59.     From October 17-23, 2021, Baluja was ordered to drill and was again placed on NO PAY status, despite not having yet used the 240 hours allotted by Fla. Stat. § 115.07 and Coral Gables Rules and Regulations 12.8-12.8.1. This action was taken as a result of Baluja's military status, a violation the FUSPA and the USERRA.

60.     On October 15, 2021, a second demand letter was sent to Defendant for proper payment to Baluja and compliance with USERRA. The City Human Resources Director, Karla Green ("Green"), Chief Hudak, and the City Manager Peter Iglesias ("Iglesias") were among the direct recipients of the demand letter and were on notice of Defendant's violations of the FUSPA and the USERRA.

61.     Defendant City responded to the demand letter with a letter from Green with the corrections to pay, return of leave, and the back pay to that date. Defendant City included Baluja's marine patrol pay and back pay from Baluja's removal date of January 7, 2019.  Defendant did not include any interest for the time that Baluja had to wait to get paid.

62.     Baluja was entitled to prompt pay and the benefits that could have been obtained of said pay had he received it in a timely fashion. The actions in delaying Baluja's pay were taken as a result of Baluja's military status, a violation the FUSPA and the USERRA.

63.     Baluja again received NO PAY status for active military orders from November 14-20, 2021, which included violations to the accrued leave policy. This action was taken as a result of Baluja's military status, a violation the FUSPA and the USERRA.

64.     Unfortunately, CGPD did not amend its practices and procedures and continued to violate USERRA and discriminate against Baluja as a result of his military service and a pattern of an even greater discriminatory work environment developed.

65.     On Tuesday, November 8, 2022, at 0700 Regional Counterdrug Training Academy ("RCTA") team members (Sergeant First Class ("SFC") Kei Huesser, SFC Seth Deerman, Baluja and SSG Chad Pittman) arrived at the CGPD to facilitate the Officer Survival Training (OST). At approximately 1030 ET, while OST was being conducted, SSG Pittman was called out of the room to meet with CGPD leadership (Chief Hudak and Assistant Chief Thomas Hanlon) and training section members (Sgt. Josh Nunez, Ofc. Jonathan Cloud, and training member Jeff Young, Florida National

Guard Command Sergeant Major Retired). During this meeting, it was interpreted that Baluja was not welcome as an instructor and was required to leave the premises or the entire RCTA team members would have to leave. At this point, SFC Huesser was called into the meeting where it was reiterated that either Baluja was required to leave or the entire RCTA team would be asked to leave. This action was taken as a result of Baluja's military status, a violation the FUSPA and the USERRA.

66.     Following this meeting with SSG Pittman, SFC Huesser and CGPD, the RCTA team members met to discuss the situation. During this time, it was decided that to continue training and not waste RCTA funding, Baluja would leave without cause. No further explanation was provided by the CGPD. This action was taken as a result of Baluja's military status, a violation the FUSPA and the USERRA.

67.     Baluja was scheduled for CGPD SWAT training with the RCTA team members from Monday, November 14, 2022, to Friday, November 18, 2022, for Tactical Arrest and Control Procedures (TACP). As a member of the CGPD, Baluja was to facilitate the training as an officer (not on orders) to reduce cost to RCTA.

68.     On November 10, 2022, at 0815 ET, Sgt. Alejandro Escobar (CGPD SWAT Acting Commander) notified Baluja via text message that the RCTA training scheduled for the next week was cancelled and would be postponed until sometime the next year. CGPD leadership decided that only SWAT members not in Uniform Patrol Division (where Baluja is currently assigned could attend). Again, no further explanation was provided. This action was taken as a result of Baluja's military status, a violation the FUSPA and the USERRA.

69.     For the last few years, City Manager of Coral Gables (Iglesias) has sent

out a letter to all the veterans currently employed to thank them for their service and provide an additional vacation day to be used on a day of their choosing. The year 2022 was no exception. Each veteran employed by the City of Coral Gables received this letter from City Manager Iglesias on November 15, 2022, which again included an additional day of leave. The letters are placed in each veteran/officer's mailbox at the station at the public safety building. The veterans/officers read their letters during roll call. Baluja never received a letter.  This retaliatory action against Baluja was taken as a result of Baluja's military status, a violation the FUSPA and the USERRA.

70.     Baluja notified his supervisor, Sergeant Tomas Salcedo ("Sgt. Salcedo"), to inquire if Baluja's letter had been misplaced. Sgt. Salcedo did not respond to Baluja's email.

71.     On December 13, 2022, Sgt. Salcedo approached Baluja after roll call at approximately 0620 EST, and asked Baluja to sign the final version of Baluja's yearly evaluation. Sgt. Salcedo explained there was a delay of multiple weeks to finalize the evaluation because Sgt. Salcedo had to meet with multiple members in his chain of command to explain why he rated Baluja "high" in several sections of the evaluation. Sgt. Salcedo reiterated that the issues are coming from the top that they are "trying to fuck you". Baluja reviewed the evaluation and signed it. The delay in Baluja's annual review was a direct result of Baluja's military status and attempts by Defendant to retaliate against him due to his military service, a violation the FUSPA and the USERRA.

72.     A review of Baluja's 2022 Employee Performance Evaluation showed a rating of 95/Very Good. In the "Rater's Supervisor Comments" it was stated that Baluja

was "highly trained" and "very dependable."

73.     On December 28, 2022, Baluja was called to a meeting at CGPD to meet with Major Jesse Medina ("Maj. Medina"), Sgt. Escobar, and Sergeant Jesus Garcia ("Sgt. Garcia") at approximately 0930 EST. Upon encountering Sgt. Escobar and Sgt. Garcia, Baluja was led into a conference room on the second floor. Prior to Maj. Medina's arrival, Baluja asked Sgt. Escobar if he needed Fraternal Order of Police ("FOP") representation and Sgt. Escobar simply stated "No". When Maj. Medina arrived, Baluja was handed a packet in which the top memorandum was Defendant Hudak with an attached memorandum from Sgt. Escobar.

74.     Sgt. Escobar's memorandum stated: "I am respectfully requesting [Baluja] be removed from the SWAT Team effective immediately." In the memorandum's background and conclusion NO explanation was given as to the cause. This action of removing Baluja from SWAT was taken as a result of Baluja's military status, a violation the FUSPA and the USERRA.

75.     When Baluja asked Sgt. Escobar what cause there was for the request for Baluja's removal from SWAT, Sgt. Escobar responded "I will answer your attorney."

76.     Sgt. Escobar was a current member of the FOP executive board, who should not have recommended against having independent FOP representation for Baluja for a disciplinary/ administrative meeting. This recommendation by Sgt. Escobar for Baluja not to have a FOP representative was as a result of Baluja's military status, a violation the FUSPA and the USERRA.

77.     The SWAT Team is one of the most prestigious units in any department. Becoming a member of the SWAT Team is not easy, from the application process to

passing the City of Miami SWAT School (one of the toughest and most respected SWAT schools in the country).

78.     Removing a SWAT Team member with no just cause violates the Collective Bargaining Agreement and erodes the morale of the department. Removing a service member from SWAT without cause simply because of his military status is a violation of the FUSPA and the USERRA.

79.     The objective of the SWAT Team as stated by CGPD Standard Operating Procedure ("SOP") #046 is containment of persons in volatile crisis situations, high risk warrant service, protection of vital installations and any other special threat or crisis situation outside the scope of normal police operations.

80.     Baluja is considered an expert in all of those areas by the US Military. His knowledge is invaluable on a young SWAT Team with minimal real-world experience.

81.     CGPD intentionally and maliciously discriminated against Baluja for his military service when removing him from SWAT without cause. CGPD does not treat other members of the SWAT Team or other employees with such hostile and malicious actions.

82.     By way of example, on April 12, 2023, while instructing a firearms training course at the Coral Gables Police Department, Sgt. Escobar negligently discharged his firearm into the cleaning table. Upon information and belief, Defendant Escobar was not suspended, was not removed from the SWAT Team, nor was he removed as a firearms instructor, despite negligently discharging his firearm with other officers present in the room. Sgt. Escobar remains on the SWAT Team to date.

83.     The term "Inactive Status" is only used in SOP #46 when a SWAT Team

Member fails to qualify. Baluja has never failed to qualify. This action of placing Baluja on Inactive Status was as a result of Baluja's military status, a violation the FUSPA and the USERRA.

84. On January 5, 2023, Baluja filed a grievance with CGPD regarding the suspension of his workout privileges as a member of the SWAT Team.

85. Less than two weeks later, on January 15, 2023, Baluja took a day of family sick leave to care for his ill fiancé at their high-rise apartment in Broward County. Despite the building security of a full-time concierge and security system and required key-fob to access all entrances to the building, elevators, and floor access, Baluja and his fiancée were startled by an obtrusive banging on their door by a CGPD Sergeant Bo Williams ("Sgt. Williams"), in uniform, to question Baluja as to his whereabouts. Sgt. Williams claimed he was doing a "wellness check" on Baluja. The "wellness check" on Baluja was committed as a result of Baluja's military status, a violation the FUSPA and the USERRA.

86. Sgt. Williams was outside of the jurisdiction of the CGPD when he utilized the CGPD police badge to gain access to Baluja's residence without authority or permission.

87. As if one instance of abuse of power was not enough, on March 13, 2023, at approximately 1530 EST, there was another obtrusively loud knock at the door of Baluja's residence. Like the previous instance on January 15, 2023, Baluja and his fiancée opened their door to find Sgt. Williams, in uniform, who claimed to have been assigned to drive to Baluja's Broward County residence to check on Baluja's location. The second "wellness check" on Baluja was committed as a result of Baluja's military

status, a violation the FUSPA and the USERRA.

88.     At no time did the Sgt. Williams request that building security or the concierge of Baluja's residence contact Baluja or his fiancée for permission to visit, but rather used his CGPD badge under false pretenses to gain access to Baluja's building outside the jurisdiction or authority of the Coral Gables Police Department. Defendant CGPD intentionally discriminated against Baluja as a result of his military status and treat him differently than other employees, a violation of the FUSPA and the USERRA.

89.     Both Baluja and his fiancée have suffered disruption and embarrassment by having their colleagues, neighbors, and building management questioning them as to why there are police officers repeatedly banging on their door.

90.     It is not Standard Operating Procedure to do a wellness check on every officer who calls in for sick leave. Baluja is being continuously targeted, harassed and discriminated against by Defendant due to his military service.

91.     On February 27, 2023, Baluja had a Step 6 Grievance Meeting with City Manager Iglesias, Chief Hudak, FOP President Christopher Challenger, and City of Coral Gables Director of Human Resources Raquel Elejabarrieta ("Ms, Elejabarrieta"). At this meeting, Mr. Challenger presented an amended grievance requesting that Baluja be returned to active duty on SWAT Team. Ms, Elejabarrieta added that Baluja's situation was "special" because USERRA regulations needed to be considered.

92.     Ms, Elejabarrieta is the City's Human Resources Director, after serving as the Director of Labor Relations and Risk Management, and the City's Chief Diversity, Equity, Inclusion and Accessibility (DEI&A) Officer. On the labor side, she is responsible for building and promoting a work environment that fosters a positive and effective

relationship between labor and management. On the risk side, she is responsible for administering the city's self-insurance program for general liability and property damage claims, as well as workers' compensation claims.  As the City's Chief DEI&A Officer, she is to provide innovative and inclusive approaches to continue building a culture of diversity, equity, inclusion, and accessibility (DAI&A) that aligns with the City's mission. As such, Ms, Elejabarrieta is in a unique position of knowledge of Defendant's obligations under Fla. Statutes chapter 115 and USERRA, and clearly demonstrated such in her meeting with Chief Hudak, Baluja, FOP President Challenger, and City Manager Iglesias.

93.     On March 10, 2023, City Manager Iglesias sent a letter to FOP President Christopher Challenger in response to Baluja's grievance dated January 5, 2023 for a grievance dated December 28, 2022. The letter denied the grievance presented by Baluja. One of the reasons provided by City Manager Iglesias was that the grievance was not presented within 14 calendar days of the occurrence which gave rise to the grievance. It is unclear what calendar City Manager Iglesias was using to calculate the number of calendar days between December 28, 2022, and January 5, 2023, but even giving City Manager Iglesias the greatest time for calculation, there are only 8 (eight) calendar days between the date the grievance occurred and the date that the grievance letter was presented, **including weekends**. Even if City Manager Iglesias began his count on the day the grievance occurred (December 28, 2022), and counted until the date the grievance was filed, the highest number of calendar days he could count would be 9 (nine).

94.     City Manager Iglesias's letter further stated that the relief sought by Baluja

was within Chief Hudak's sole discretion. As previously stated, and had been previously been made aware to City Manager Iglesias, Chief Hudak had a practice of discriminating against Baluja as a result of his military status, in direct violation of the FUSPA and the USERRA.

95.     City Manager Iglesias's March 10, 2023 letter in support of Chief Hudak's discriminatory and hostile treatment of Baluja further reflects Defendant's willful violations of the FUSPA and the USERRA.

96.     In an unprecedented breach of protocol, on or about the same date that City Manager Iglesias sent the letter denying Baluja's grievance, Chief Hudak circumvented  Baluja's provided military command contact (company operations warrant officer), and instead contacted the Group Commander by information Chief Hudak obtained through U.S. Southern Command. Chief Hudak did this in order to gain privileged and confidential operational information under the guise of having been contacted by the media to do an  article on Baluja. Chief Hudak further requested Baluja's service record, active combat, training records, and information on length of service of deployments.

97.     Chief Hudak's blatant attempt to circumvent the proper channels, and Chief Hudak's malicious and discriminatory practices towards Baluja due to his military service, are a direct and reckless disregard for  operational security, Baluja's safety, the safety of those with whom Baluja serves, and endanger the interests of the United States. Chief  Hudak's actions were discriminatory and retaliatory towards Baluja as a result of his military service, in direct violation of the FUSPA and the USERRA.

98.     As a result of Chief Hudak's email to the Group Commander, on March

10, 2023, **Baluja received a written reprimand** from CW2 Robert Knight, U.S. Army, which specifically referenced Chief Hudak's email and the inappropriateness of the information requested by Chief Hudak.

99.     Defendant's blatant disregard for Baluja's military orders even required the involvement of Captain J.D. Little,  Battalion Judge Advocate General for the 2nd Battalion, 20th Special Forces Group,  on more than one occasion.

100.    On May 16, 2023 Baluja filed a complaint in the Eleventh Judicial Circuit in and for Miami-Dade, Florida, against the City, the City's Police Department, CGPD Chief Edward Hudak, CGPD Lieutenant John Carrasco, CGPD Sergeant Alejandro Escobar, City Manager Peter Iglesias, City of Coral Gables Director Of Human Resources Raquel Elejabarrieta, and City Director of Human Resources Karla Green.

101.    Within two weeks of filing the action, Lt. John Carrasco, who was named in the complaint as a defendant, was put in Baluja's direct chain of command. As his direct chain of command, Lt. Carrasco approves Baluja's evaluations. Lt. Carrasco remains in Baluja's direct chain of command to date.

102.    The action was removed to federal court on June 23, 2023.

103.    Baluja was called to duty on or about July 19, 2023, for extended military leave.

104.    During his deployment, Baluja was locked out of the INFOR system, the City's' paycheck viewer application.. In addition, Defendant City failed to properly and consistently pay Baluja from September 14, 2023 through June 6, 2024.

105.    On March 22, 2024, Baluja emailed the Fraternal Order of Police to inquire about who Baluja should contact in reference to his transition from active duty back to

the CGPD.

106.    Three weeks later, on April 15, 2024, Baluja received an email from Sgt.

Williams regarding Baluja's transition, to which Baluja replied and attached his Release

From Active Duty (REFRAD) Order, effective date May 27, 2024. Baluja also informed

Sgt. Williams that he would be utilizing his 90-day USCERRA post-deployment leave.

107.    On April 19, 2024, Baluja received an email from City Compensation &

Benefits Manager Krizia McGraw which stated, in relevant part:

> Both the Police Department and HR have received your updated order
> showing official separation from active duty on May 27, 2024, and will continue
> to carry you on military leave with military supplemental pay (based on
> provided Military LES statements) through that date. The Police Department
> should be reaching out to you to confirm your official return to work date.
>
> Lastly, once this current pay period concludes, I will be conducting an audit on
> your pay since we transitioned to the INFOR system to determine any
> corrections that may be needed. This audit will cover all of the paystubs I
> attached to this email. I will detail my findings in a spreadsheet and provide it
> to you once finalized.

108.    On May 28, 2024, Baluja received an email from CGPD Major Jennie Hoff

("Maj. Hoff"), requesting that Baluja disregard Sgt. William's April 15th email, and

requesting that Baluja "inform Human Resources" of his leave preference. Baluja

responded asking for clarification as to whom he should be corresponding, and he

received an email from Ms. Elejabarrieta, requesting that Baluja send all

communications regarding accrued leave to City Assistant Director of Human

Resources & Risk Management Jose Rodriguez ("Rodriguez") and Director Of Human

Resources Raquel Elejabarrieta, and City Compensation Coordinator, Nora Arguello

("Arguello").

109.    The next day, Baluja followed up with Mr. Rodriguez and Ms. Arguello in

an attempt to confirm receipt of Baluja's May 28, 2024 email, and to avoid any further

discrepancies in Baluja's pay.

110.    On June 4, 2024, Rodriguez informed Baluja that while Baluja's request

had been received, however, to use accrued sick leave, Baluja "will need to provide a

medical certificate, or doctors note to have accrued sick leave applied to the pay

periods specified."

111.    Two days later, Baluja provided a physician's note, as requested, and

reaffirmed that he would be utilizing his 90-day USCERRA post-deployment leave. The

June 6, 2024, Physician's note stated:

> 1. SFC Michael Baluja is at this time undergoing a command directed medical evaluation for various issues associated with his military service. 2. SFC Baluja's evaluation and treatment is ongoing and his completion date is currently undetermined. We anticipate his Medical Evaluation Board (MEB) should be completed within the next twelve (12) months.

112.    On June 11, 2024, Mr. Rodriguez sent another email to Baluja regarding

Baluja's leave:

> We have carefully reviewed the medical treatment note you submitted. However, the note does not provide us with sufficient information to determine whether to grant the use of sick leave for the pay period you requested, from June 3rd through June 16th. Specifically, the note does not state that you are unable to work during the specific time period for which you requested sick leave. We kindly ask that your medical provider clarify this point so that we can determine whether the use of sick leave for the requested time period can be approved.  Please know that, if you are unable to obtain clarification from your medical provider, you can also consider using your accrued annual leave to cover these absences.  With respect to your reference to USERRA, we are aware that you have 90 days from the date of completion of your service to apply for reemployment and will ensure compliance with all USERRA regulations.

113.    Baluja submitted a second memorandum from his physician the same

day. The June 11, 2024 Physician's note stated:

1. SFC Michael Baluja is at this time undergoing a command directed medical evaluation for various medical issues associated with his military service. 2. During the period of this evaluation SFC Baluja is not authorized to work or engage in physical training until medically cleared. 3. SFC Baluja's evaluation and treatment is ongoing and his completion date is currently undetermined. We anticipate his Medical Evaluation Board (MEB) should be completed within the next twelve (12) months.

114. On June 12, 2024, Rodriguez informed Baluja that the June 11, 2024 physician memorandum was received and that his sick leave request was being processed.

115. On June 26, 2024, Baluja was ordered to Annual Training on July 28-August 11, 2024. Baluja promptly provided the orders for military leave to Defendant's HR department as instructed.

116. On July 30, 2024, Sgt. Williams informed Baluja that his military leave dates had been received, but that "I have been advised an Action Memo will still be required." It was not clear from the email who advised Sgt. Williams that Baluja would also have to submit an Action Memo.

117. Baluja responded to Sgt. Williams the same day, attaching the requested Action Memo, as well as the June 29, 2024 order, and the Department of Labor VETS USERRA Fact Sheet. CGPD employees Lt. Carrasco and Maj. Hoff were copied on the email, as were City employees Mr. Rodriguez and Ms. Elejabarrieta.

118. In addition to the email from Sgt. Williams, Baluja received an email from Mr. Rodriguez informing Baluja that he needed to follow the "typical process for military orders through the Police Department", even though the CGPD had instructed Baluja to go through the City's Human Resources Department.

119. On August 8, 2024, Baluja requested that his sick leave be applied for the

next pay period.

120.    The audit promised by Defendant's Compensation & Benefits Manager McGraw on April 19, 2024,  was sent to Baluja on August 12, 2024, by Mr. Rodriguez.

121.    Rodriguez responded to Baluja's August 8th email on August 13th, informing Baluja that he would have to submit a new medical treatment note in order to have sick leave applied to the next pay period, despite the fact that the previous medical note covered a 12-month period.

122.    Baluja replied to Rodriguez's email on August 13th the next day, and attached a medical treatment memorandum, which states in relevant part:

> 1. As noted in my previous memorandum dated 11 June 2024, SFC Michael Baluja is undergoing a command directed medical evaluation for various medical issues associated with his military service. During this period SFC Baluja is not authorized to work or engage in physical training until medically cleared. 2. As previously advised, SFC Baluja's evaluation and treatment is on-going at this time, and his completion date is currently undetermined. We anticipate his Medical Evaluation Board (MEB) should be completed within the next twelve (12) months.

123.    On August 15, 2024, Baluja responded to the internal audit, identifying the inconsistencies and discrepancies of the City's audit, including, but not limited to: (1) the audit starts on December 31, 2023, but Baluja's active duty commenced on August 4, 2023, (2) after the first 30 days of full pay, Baluja received fluctuating amounts throughout the remainder of his active duty; (3) the audit did not cover the entirety of Baluja's active duty (8/4/23-5/27/24); and (4) the payment figures on the audit did not match the payments received by Baluja.

124.    Baluja was supposed to be able to return to duty on  Friday, August 23, 2024.

125.    When Baluja had still not received responses from multiple emails to Defendant and its CGPD, on August 20, 2024, Baluja reached out to Defendant again to finalize and coordinate his return to CGPD duty.

126.    Mr. Rodriguez responded that "upon [Baluja's] return [Baluja] will be placed on administrative leave with pay. [Baluja] will be on administrative leave until we have received the completed Healthcare Provider & Essential Job Functions Inquiry Form.

127.    While Baluja was attempting to coordinate his return to CGPD, Chief Hudak again reached out to Baluja's military command regarding Baluja's military service.

128.    Baluja returned the Healthcare Provider & Essential Job Functions Inquiry Form on August 28, 2024. The form was executed by Colonel Cristobal V. Mandry on August 26, 2024. Per the form provided by Colonel Mandry, Baluja was fully cleared for duty, including airborne operations and overseas deployment, which supersedes the job requirements of a City Police Officer.

129.    On August 29, 2024, Mr. Rodriguez emailed Baluja informing Baluja that the City would not be accepting that Baluja was fit for duty:

> "Thank you for providing the essential job function inquiry signed by your treating physician. Given that the information provided by your treating physician in the essential job functions inquiry appears to be inconsistent with the several notes that same treating physician has provided over the last few months (including his August 14, 2024 doctor's note), and that your treating physician has not provided any explanation for these apparent inconsistencies, we have determined that fitness for duty certification is currently insufficient.  The City would like to follow up with your doctor to seek clarification on the information he has provided.  Additionally, based on these apparent inconsistencies, the City may require that you undergo a medical examination by a health care professional of the City's choice, which will allow the City to determine whether you can safely perform the essential functions of

your job.

"With respect to your return, you are already deemed to have returned to work, but you will remain on administrative leave with pay until the City is able to obtain clarification on the points referenced above."

130.    Baluja replied on August 29, 2024, with copies to Ms. Elejabarrieta, FOP President Christopher Challenger, Dr. Mandry, and CPT J. D. Little, 2nd Battalion 20th Special Forces Group (A) JAG. Baluja's reply attached a secondary medical examination completed by Baluja's primary care physician, Dr. Gregory Fox.

131.    It is the flagrant disregard of the FUSPA and the USERRA regulations, continued violations of the FUSPA and the USERRA, and maintaining a discriminatory and hostile work environment that are the basis of this lawsuit against Defendant.

132.    This pattern of the FUSPA and the USERRRA violations as well as discriminatory and hostile work environment based on Baluja's military service continues to date.

**Baluja has Suffered, and Continues to Suffer, Severe Emotional Distress**

133.    As a result of Defendant's intentional and outrageous conduct in discriminating against Baluja as a result of his military service, Baluja has suffered, and continues to suffer, severe emotional distress and mental suffering in the form of psychological trauma, extreme anxiety, fear, and debilitating anger.

134.    Baluja's continuing and devastating psychological trauma, extreme anxiety, fear as to constant retaliation, hostile work environment, and debilitating anger, has caused Baluja to lose enjoyment of life.

135.    Defendant had actual knowledge of its intentional wrongful conduct and certainty that Baluja would suffer psychological and monetary damages and injury.

Despite that knowledge, Defendant intentionally pursued its discriminatory course of conduct against Baluja as a result of his military service, resulting in injury and damages to Baluja.

136.   Defendant's targeting and discrimination of Baluja as a result of his dedication and service to the United States Armed Forces is outrageous, beyond all bounds of decency, odious, and utterly intolerable in a civilized community. Targeting a servicemember and creating an environment where Baluja's co-workers ostracize him and fear working with him lest they also be subject to retaliation is impermissible under any standard.

137.   The intentional, willful, wanton, outrageous, and contemptible conduct of Defendant was so reckless or wanting in care that it constituted a conscientious disregard or indifference to the life, safety, and rights of Baluja.

138.   Baluja has hired the undersigned law firm to prosecute his claims and is obligated to pay them a reasonable fee for its services.

**COUNT I - UNIFORMED SERVICES EMPLOYMENT AND REEMPLOYMENT RIGHTS ACT OF 1994 ("USERRA"), AS AMENDED, 38 U.S.C. §§ 4301 *ET SEQ.*; DISCRIMINATION AND REPRISAL PURSUANT TO 38 U.S.C. §§ 4311, 4312**

139.   Baluja re-alleges and re-avers paragraphs 1-138 as if fully set forth herein.

140.   At all times relevant herein, Baluja was a member of, performed services for, or had obligations to perform services in, the uniformed services as defined by USERRA..

141.   Defendant, by and through their agents and employees, denied Baluja's retention of employment because of Baluja's membership in, performing services for, or having obligations to perform services for, the uniformed services as defined by USERRA.

142.     Defendant, by and through its agents and employees, unlawfully discriminated and retaliated against Baluja by taking adverse employment actions because Baluja took action to enforce a protection afforded persons pursuant to USERRA, or because he exercised rights provided for by USERRA.

143.     Defendant engaged in actions prohibited by USERRA because Baluja's membership, service, or obligation for service in the uniformed services as defined pursuant to USERRA, was a motivating factor in Defendant's adversarial employment decisions against Baluja.

144.     Defendant would not have taken the same adverse employment action against Baluja in the absence of such membership, service, or obligation for service in the

uniformed services as defined pursuant to USERRA.

145.     The acts and omissions committed by Defendant by and through their agents and employees in violating Baluja's rights under USERRA, were willful.

146.     Defendant was on notice of their obligations under USERRA from federal law and multiple notices to Defendant from Plaintiff, the Fraternal Order of Police, and the United States Judge Advocate General that its actions violated USERRA. Defendant showed a reckless disregard for these matters through its actions and omissions.

147.     As a direct and proximate result of the actions and omissions committed by Defendant, by and through their agents and employees, Baluja has suffered and will continue to suffer lost wages, benefits and entitlements.

148.     Baluja's performance records with Defendant makes it clear that Defendant's issues with Baluja are a direct result of his compliance with his calls to duty

for military service.

149.   Even if Defendant had a legitimate, non-discriminatory reason, Baluja's military status and/or service is, at minimum, a motivating factor in Defendant's decisions for demoting Baluja and Defendant's harassing behavior towards Baluja.

150.   Baluja is entitled to such affirmative relief as may be appropriate, including, but not limited to, lost wages, benefits, and compensation for emotional distress, pursuant to the provisions of USERRA as a direct result of Defendant's discriminatory actions.

151.   Baluja, based on information and belief, alleges that Defendant's actions were done with malice, and with disregard for her protected rights under USERRA. Therefore, Baluja is also entitled to liquidated damages from Defendant in an amount equal to lost wages (front and back pay) and benefits.

WHEREFORE, Baluja respectfully requests that judgment be entered in his favor against Defendant:

a.   Declaring, pursuant to 29 U.S.C. §§ 2201 and 2202, that the acts and practices complained of herein are in violation of USERRA;

b.   Declaring that Defendant's conduct was willful as defined by 38 U.S.C. 4323(d) and 20 C.F.R. § 1002.312(c);

c.   Awarding Baluja front pay; providing back pay and benefits with interest; and ordering Defendant to pay compensatory damages;

d.   Equitable relief in the form of reinstatement and the use of the Court's full equity powers to vindicate fully Baluja's rights or benefits pursuant to 38 U.S.C. § 4323(e);

e.      Awarding Baluja liquidated damages in an amount equal to the award of front pay and back pay;

f.      Awarding Baluja reasonable attorney's fees and costs and expenses of the litigation;

g.      Awarding Baluja pre-judgment interest;

h.      Ordering any other further relief the Court deems just and proper.

**COUNT II - VIOLATION OF SERVICEMEMBERS CIVIL RELIEF ACT ("SCRA"), 50 U.S.C. §§ 3901 *ET SEQ***

152.    Baluja re-alleges and re-avers paragraphs 1-138 as if fully set forth herein.

153.    At all times relevant herein, Baluja was a member of, performed services for, or had obligations to perform services in, the uniformed services as defined by the SCRA, 50 U.S.C. § 3911.

154.    In violation of the SCRA, Defendant, by and through its agents and employees, denied Baluja's retention of employment because of Baluja's membership in, performing services for, or having obligations to perform services for, the uniformed services as defined by the SCRA.

155.    Defendant, by and through its agents and employees, unlawfully discriminated and retaliated against Baluja by taking adverse employment actions because Baluja took action to enforce a protection afforded persons pursuant to the FUSPA, or because he exercised rights provided for by the SCRA.

156.    Defendant engaged in actions prohibited by the SCRA because Baluja's membership, service, or obligation for service in the uniformed services was a motivating factor in Defendant's adversarial employment decisions against Baluja.

157.    Defendant violated Baluja's rights under the SCRA by discriminating,

retaliating against, and denying reemployment because of Baluja's need for protected leave.

158. Further, Defendant treated Baluja in a disparate manner with regard to its leave policies solely because of Baluja's exercise of his rights under the SCRA.

159. Defendant would not have taken the same adverse employment action against Baluja in the absence of such membership, service, or obligation for service in the uniformed services.

160. The acts and omissions committed by Defendant by and through its agents and employees in violating Baluja's rights under the SCRA were willful.

161. As a direct and proximate result of the actions and omissions committed by Defendant, by and through their agents and employees, Baluja has suffered and will continue to suffer lost wages, benefits and entitlements.

162. Baluja's performance records with Defendant makes it clear that Defendant's issues with Baluja are a direct result of his compliance with his calls to duty for military service in service of his and the City's country.

163. Even if Defendant had a legitimate, non-discriminatory reason, Baluja's military status and/or service is, at minimum, a motivating factor in Defendant's decisions for demoting Baluja and Defendant's harassing behavior towards Baluja.

WHEREFORE, Baluja respectfully requests that judgment be entered in his favor against Defendant:

a. Awarding Baluja front pay, providing back pay and benefits with interest;

b. Ordering Defendant to pay compensatory damages;

c. Awarding Baluja liquidated damages in an amount equal to the award of

front pay and back pay;

   d.   Awarding Baluja reasonable attorney's fees and costs and expenses of the litigation;

   e.   Awarding Baluja pre-judgment interest;

   f.   Ordering any other further relief the Court deems just and proper.

## COUNT III - VIOLATION OF FUSPA

164.   Baluja re-alleges and re-avers paragraphs 1-138 as if fully set forth herein.

165.   At all times relevant herein, Baluja was a member of, performed services for, or had obligations to perform services in, the uniformed services as defined by the FUSPA.

166.   In violation of the FUSPA, Defendant, by and through its agents and employees, denied Baluja's retention of employment because of Baluja's membership in, performing services for, or having obligations to perform services for, the uniformed services as defined by the FUSPA.

167.   Defendant, by and through its agents and employees, unlawfully discriminated and retaliated against Baluja by taking adverse employment actions because Baluja took action to enforce a protection afforded persons pursuant to the FUSPA, or because he exercised rights provided for by the FUSPA.

168.   Defendant engaged in actions prohibited by the FUSPA because Baluja's membership, service, or obligation for service in the uniformed services was a motivating factor in Defendant's adversarial employment decisions against Baluja.

169.   Defendant violated Baluja's rights under the FUSPA by discriminating, retaliating against, and ultimately terminating his employment because of his need for

protected leave.

170.    Further, Defendant treated Baluja in a disparate manner with regard to its leave policies solely because of Baluja's exercise of his rights under the FUSPA.

171.    Defendant would not have taken the same adverse employment action against Baluja in the absence of such membership, service, or obligation for service in the uniformed services.

172.    The acts and omissions committed by Defendant by and through its agents and employees in violating Baluja's rights under the FUSPA were willful.

173.    As a direct and proximate result of the actions and omissions committed by Defendant, by and through its agents and employees, Baluja has suffered and will continue to suffer lost wages, benefits and entitlements.

174.    Baluja's performance records with Defendant makes it clear that Defendant's issues with Baluja are a direct result of his compliance with his calls to duty for military service.

175.    Even if Defendant had a legitimate, non-discriminatory reason, Baluja's military status and/or service is, at minimum, a motivating factor in Defendant's decisions for demoting Baluja and Defendant's harassing behavior towards Baluja.

WHEREFORE, Baluja respectfully requests that judgment be entered in his favor against Defendant:

a.    Awarding Baluja front pay, providing back pay and benefits with interest;

b.    Ordering Defendant to pay compensatory damages;

c.    Awarding Baluja liquidated damages in an amount equal to the award of front pay and back pay;

d.      Awarding Baluja reasonable attorney's fees and costs and expenses of the litigation;

e.      Awarding Baluja pre-judgment interest;

f.      Ordering any other further relief the Court deems just and proper.

### COUNT IV - INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

176.   Baluja re-alleges and re-avers paragraphs 1-138 as if fully set forth herein.

177.   Defendant's willful violations of the FUSPA, the SCRA, and the USERRA, and discriminatory practices against Baluja due to his military service was intentional, or at the very least reckless, in that Defendant knew or should have known that Baluja's emotional distress would likely result.

178.   Defendant's actions caused Baluja severe emotional distress and mental anguish in the form of devastating psychological trauma, extreme anxiety, fear, and debilitating anger. Baluja's continuing emotional distress and mental suffering has resulted in loss of life enjoyment.

179.   Baluja has been damaged by Defendant's actions. Specifically, Baluja suffered and continues to suffer severe emotional distress, substantial lost earning and profit from the actions of Defendant, and significant interruption to his life by Defendant's abuse of authority to violate Baluja's personal space.

180.   Defendant, due to the actions of the legions of employees that  it has used to attack Baluja,  is personally guilty of intentional misconduct or gross negligence, as alleged herein.

WHEREFORE, Baluja respectfully requests judgment against Defendant for damages caused by Defendant's intentional infliction of emotional distress, including

pre-judgment interest, and punitive damages, along with such other relief the Court

deems just and proper.

        Dated:  September 9, 2024        Respectfully submitted,

                                Susan Elizabeth Klock, Esq., FBN 41294
                                Rasco Klock Perez & Nieto, P.L.
                                2555 Ponce de Leon Blvd., Ste 600
                                Coral Gables, FL 33134
                                Telephone: 305.476.7113
                                sklock@rascoklock.com

                                *Attorneys for Plaintiff. Michael Baluja*

                                By: *Susan Elizabeth Klock*
                                Susan Elizabeth. Klock, Esq